DECISION
Appellants Frederick and Louise Williams ("the Williamses" or "Appellants") appeal from a decision of the Rhode Island Coastal Resources Management Council ("CRMC" or "the Council"), denying their application for permission to alter a freshwater wetlands in order to construct a single-family residence. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 I Facts and Travel
The parcel of property in question is located at 645 West Main Road in Little Compton, Rhode Island and is known as Tax Assessor's Plat 7, Lot 8 ("the property"). The property encompasses 5.2 acres and consists primarily of a forested swamp, a *Page 2 
defined category of freshwater wetland[1] regulated by CRMC's Rules and Regulations Governing the Protection and Management of Freshwater Wetlands in the Vicinity of the Coast ("CRMC Wetlands Rule(s)"). Notably, two buildable upland areas are located in the property's northeastern and southwestern corners (the "Northeastern Upland" and "Southwestern Upland," respectively).
In 2004, Appellants filed an application with CRMC seeking permission to alter a freshwater wetland. (Admin. R. 31-32.) Specifically, Appellants sought to construct a three-bedroom single-family home on the property's Northeastern Upland. In addition to the dwelling house itself, Appellants' application contemplated construction of a detached shed and driveway, an individual well, and an individual sewage disposal system ("ISDS"). Id. at 36. As proposed, the project would have resulted in approximately 10,840 square feet of encroachment on jurisdictional wetlands of which *Page 3 
approximately 3800 square feet would have occurred within the swamp itself. Id. at 68-69.
Pursuant to CRMC Wetlands Rule 10.03(A)(2), [2] the Appellants also submitted a written evaluation of the biological impact the proposed alterations would likely have on the affected wetlands. Id. at 64-89. The written evaluation, penned by wetland biologist Scott P. Rabideau ("Rabideau"), concluded that the Appellants' proposed alterations had avoided or reduced wetlands impact to the maximum extent possible, eliminated or minimized potential impacts to the wetlands' functions and values, and would not contribute to adverse cumulative impacts on the affected wetlands. Id. at 80. Upon receipt of the Williamses' application and Rabideau's written evaluation, CRMC posted public notice of the Appellants' proposal. Id. at 36.
On November 12, 2004, environmental advocacy group Save The Bay filed a letter with the CRMC, urging the Council to deny the Williamses' application. Id. at 53-55. In its letter, Save The Bay asserted that the Appellants' proposed project failed to sufficiently satisfy the burden placed upon applicants seeking to alter wetlands as *Page 4 
specified in CRMC Wetlands Rule 10.01(A).[3] Save The Bay averred that the Appellants failed to show that their plans had avoided all probable impacts to the maximum extent possible. Id. In addition, Intervenor Sakonnet Preservation Association ("SPA"), a nonprofit land trust dedicated to preserving the natural resources of Little Compton and owner of an interest in land directly abutting the Appellants' property, filed an objection to the pending proposal wherein the SPA adopted by reference the comments submitted by Save The Bay. Id. at 58.
Subsequently, David S. Reis ("Reis"), a Supervising Environmental Scientist in CRMC's Biology Section, was assigned to evaluate the Williamses' application. On January 26, 2006, Reis issued a report in the form of a CRMC inter-office memo sent to CRMC Executive Director Grover J. Fugate ("Director Fugate"). Id. at 38-44. Reis's report concluded that the Appellants' proposal avoided and minimized wetland impacts to the maximum extent possible and that the proposal did not represent a random, unnecessary, or undesirable alteration of the affected wetlands, thereby concurring with the conclusions of Rabideau's written evaluation of the project. Id. at 41. Accordingly, Reis recommended CRMC approval of the project subject to several stipulations. Id. *Page 5 
Among Reis's recommended stipulations was a proviso that the Appellants execute and record a conservation easement in favor of the CRMC in order to protect the remaining wetlands on the subject lot. Id.
Two months later, on March 28, 2006, the CRMC held its first public hearing on the instant matter. At the hearing, Reis appeared before the Council and gave testimony that echoed the conclusion he had reached in his written report. (3/28/06 H'rg Tr. 91-98.) Reis stated that he recommended approval of the project "with some very strict stipulations and a conservation easement. . . ." Id. at 98:17-19. In addition, Mr. Rabideau, whose qualifications to offer expert testimony as a wetland biologist were presented before the Council, testified regarding his determination that the Northeastern Upland of the subject property was an appropriate situs for the proposed project. Id. at 106:9-129:5. Rabideau opined that the Northeastern Upland locale was preferable to the Southwestern Upland because construction on the Northeast Upland "would have far less impact to the function and value of [the] wetlands. . . ." Id. at 114:8-13.
Responding to Rabideau's contentions, Cynthia Giles ("Giles") of Conservation Law Foundation ("CLF"), an environmental advocacy organization, voiced objections to the Williamses' proposal.[4]Id. at 160-167. Giles observed that under the applicable CRMC Wetlands Rules, "it must be demonstrated before [CRMC] approval can be given that the [wetland] alteration [under consideration] has been avoided and minimized to the maximum extent possible. . . ." Id. at 164:16-19. Giles further noted that Reis's written report, recommending approval of the project, was inconsistent with the *Page 6 
applicable standard because the report filed by Reis contained a notation that "[i]mpacts to the wetlands may have been reduced somewhat through construction of a smaller dwelling. . . ." Id. at 164:23-165:1. Consequently, upon motion made by Councilman Michael Sullivan, the Council unanimously agreed to table its vote on the application in order to allow the Appellants to modify their proposal in an effort to decrease the footprint of the project. Id. at 191:10-18.
Nearly one year later, on February 20, 2007, the Williamses, through Rabideau, submitted a comprehensive revised site plan proposal to CRMC biologist Reis. (Admin. R. 30.) In addition, Rabideau penned a letter to Reis, dated March 16, 2007, wherein Rabideau summarized the revisions that had been made to the original proposal. Id. at 28. Rabideau wrote:
 The previous plan would have resulted in 10,840 square feet of disturbance to jurisdictional wetland. Of that total, 3800 square feet would have occurred within the swamp itself, the balance affecting the area within 50 feet of the swamp. . . .
 The current proposal would result in 6650 square feet of alteration to jurisdictional freshwater wetland, with 1100 square feet occurring in the swamp itself. Id.
The following week, after reviewing the revised plans, Reis filed an amended staff report with the CRMC in which Reis maintained his recommendation that the Council should approve the Williamses' proposal.Id. at 5-6.
The Council reconvened its hearing on the Williamses' amended application on April 24, 2007. (4/24/07 Hr'g Tr. 1-2.) After receiving testimony from Reis, Rabideau, and Giles regarding the amended application, Councilman Neill Gray voiced continued *Page 7 
concern about moving forward with the Williamses' proposal at that time. Councilman Gray stated:
 I don't understand why the applicant hasn't considered making a different configuration of [the] footprint that still allows them pretty much the same square footage. . . . I think [the applicant] can get out of the wetland and keep his footprint. Id. at 115:1-11.
After conferring with his clients, counsel for the Williamses responded to Councilman Gray's concerns by stating:
 [W]hat we could suggest would be a situation where we would agree that no part of the house and none of the fill would be located in a wetland, and the only exception would be the well, which would be a temporary disturbance, and then we would attempt, as suggested, to try to redesign the house to keep the house and any part of the fill out of the wetland. Id. at 116:12-18.
Consequently, the Council once again postponed a recorded vote on the matter in order to permit the Williamses to further modify their plans.Id. at 116-118. On June 6, 2007, Rabideau submitted a further revised site plan ("the June revisions") to Mr. Reis. Upon review of the June revisions, Reis filed a second amended staff report wherein he wrote that "the Staff Biologist maintains a recommendation for approval." (Admin. R. 3.) Reis's recommendation was further documented in a CRMC decision worksheet approved and signed by Director Fugate.[5]Id. at 4. However, when the June revisions were presented to the full CRMC on September 11, 2007, the Council *Page 8 
voted to continue the matter for an additional four weeks.[6] (9/11/07 Hr'g Tr. 103:15-106:17.)
On October 9, 2007, the Council commenced its fourth and final hearing on the Williamses' application. (10/9/07 Hr'g Tr. 1-2.) At the hearing, CMRC Biologist Reis testified that upon review of the Williamses' most recent proposal, he did not alter his staff report in any way, and continued to recommend approval for the project. Id. at 62:4-7. In addition, Scott Rabideau proffered testimony before the Council describing the most recent effort to reduce the footprint of the proposed structures and the consequential impact of the revised project to the protected wetlands. Id. at 64-68. Rabideau stated:
 [T]he previous proposal had resulted in 3,800 square feet of the swamp being effected [sic] . . . [W]ith this new scenario, by shrinking the house down, removing, or limiting the grading behind the house, we have, in fact, reduced that alteration to the swamp itself down to 375 square feet, and that 375 square feet is simply for the well. . . . The balance of the project would occur within 50 feet of the swamp or the perimeter wetland, and that will result in 5,350 square feet of perimeter wetland, so that would be a permanent alteration. But that's a significant reduction from the 10,000 total that we had on the previous iteration of this project. Id. at 65:9-66:5.
Rabideau further testified that it was his position that the plans before the Council were in compliance with all applicable CRMC Wetlands Rules. Id. at 68:2-12.
Responding to Rabideau's contentions, CLF's Cynthia Giles reiterated her objection to the Williamses' proposal. Id. at 73-76. Giles stated that though the revised plans would ensure that the residence was constructed outside the swamp itself, the *Page 9 
proposal continued to call for construction that would occur entirely within CRMC jurisdictional wetlands. Id. at 74. Consequently, according to Giles, denial of the Williamses' application would advance the Council's mandate to protect the coastal resources of the State of Rhode Island. Id.
As the hearing drew to a close, Councilman Donald T. Gomez ("Gomez") revealed that he had visited the subject property several times, on his own accord, to investigate the area. Gomez stated:
 I have been all over this property, and I've made it a personal issue this year to stop there on a number of occasions . . . I visited three times during the months of May and June, and in each of these times I went to the upland area where the proposed house is to be located, and in the perc pipes there was always 18 to 20 inches of water. . . . My first [trip], I spent maybe eight or nine, ten minutes, I came out and I removed ten ticks crawling up my leg. There was just a tick infestation. A little later in the year, there was a tremendous amount of mosquitoes. Id. at 80:15-81:15.
In addition, Gomez mentioned that he had sought out the opinions of an official from the Little Compton Fire Department with respect to the property at issue:
 I then took a look at the fire code. I spoke with the local captain of the fire department in Little Compton, Captain Medeiros, the Chief wasn't available, and I asked him . . . what the fire department would like to see in an area to access the building, and basically his comment, he supplied a lot of excerpts from the present fire code. I went on line to look for it and found out that you had to buy the fire code. I didn't purchase it. I don't think CRMC has a copy of it, so I worked with his, what he supplied to me in a cut and paste fashion. But, he had indicated to me that the fire department would certainly like to see a 20-foot buffer around the building, an ambulance, those types of emergencies that would require access to the back of the building. We heard tonight that this is still a 10-foot buffer. Id. at 81:15-82:11. *Page 10 
Shortly thereafter, Councilman Gomez made a motion to deny the Williamses' application, which was seconded by Councilman Bruce Dawson.Id. at 97:24-95:6. Subsequently, the Council voted to deny the proposed wetland alterations by a vote of 5 to 3. Id. at 102:1-103:10.
On February 20, 2008, the Council issued a two and one-half page written decision formally denying the Appellants' application. (Decision at 3.) Five days later, the Council mailed a copy of its written decision to the Williamses. Appellants thereafter filed a timely appeal of the Council's decision to this Court on March 20, 2008. Consequently, SPA, CLF, and Save The Bay filed a motion to intervene in the case at bar. On August 28, 2008, the motion was granted as to SPA but denied as to CLF and Save The Bay.
Before this Court, Appellants first contend that the CRMC's decision is not supported by legally competent evidence. Appellants assert that the Council improperly relied upon evidence obtained as a result ofex parte communications, which are prohibited under the Rhode Island Administrative Procedures Act ("APA"), in rendering a decision on their application. Secondly, Appellants argue that the CRMC's decision was arbitrary, capricious, and clearly erroneous, as Appellants assert that it ignored uncontradicted and substantial evidence that the proposed alterations met the requirements and standards of the applicable wetlands regulations.
Conversely, the Council and Intervenor SPA contend that, contrary to the Appellants' assertion, the CRMC did not violate the ex parte
provisions of the APA. Further, the Council and SPA argue that the CRMC's final decision in the instant matter *Page 11 
was supported by competent evidence in the record and is therefore not arbitrary, capricious, or clearly erroneous.
 II Standard of Review
This Court "sits as an appellate court with a limited scope of review" when reviewing the decisions of an administrative agency such as the CRMC. Mine Safety Appliances Co. v. Berry, 620 A.2d 1255, 1259 (R.I. 1993). Appellate review of agency actions is governed by the Rhode Island APA, § 42-35-1, et seq. Iselin v. Retirement Bd. of Employees'Retirement System of Rhode Island, 943 A.2d 1045, 1048 (R.I. 2008) (citing Rossi v. Employees' Retirement System of Rhode Island,895 A.2d 106, 109 (R.I. 2006)). The applicable standard of review, codified at § 42-35-15(g), provides:
 The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. *Page 12 
In reviewing an agency decision, this Court is limited to an examination of the certified record in deciding whether the agency's decision is supported by substantial evidence. Center for BehavioralHealth, R.I., Inc., v. Barros, 710 A.2d 680, 684 (R.I. 1998) (citations omitted). Substantial evidence has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means more than a scintilla but less than a preponderance." Wayne Distrib. Co. v. R.I. Comm'n for Human Rights,673 A.2d 457, 459 (R.I. 1996) (citing Newport Shipyard Inc. v. R.I. Comm'nfor Human Rights, 484 A.2d 893, 896 (R.I. 1994)). Additionally, when examining the certified record, this Court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. Interstate Navigation Co. v. Div. of Pub. Utils. Carriers of R.I., 824 A.2d 1282, 1286 (R.I. 2003) (citations omitted). Accordingly, this Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Baker v. Dept. of Employment Training Bd. of Review, 637 A.2d 360, 363 (quoting Milardo v. CoastalRes. Mgmt. Council, 434 A.2d 266, 272 (R.I. 1981)).
 III The CRMC's Statutory Scheme and AdministrativeRegulations
It is the stated policy of the State of Rhode Island "to preserve, protect, develop, and where possible, restore the coastal resources of the state for this and succeeding generations through comprehensive and coordinated long-range planning and management designed to produce the maximum benefit for society from such coastal resources. . . ." Section 46-23-1. To advance these policy objectives, the General Assembly created the Coastal Resources Management Council and established as its *Page 13 
primary responsibility "the continuing planning for and management of the resources of the state's coastal region." Section 46-23-6(1). In furtherance of that charge, the General Assembly has conferred upon the Council the power to "`approve, modify, set conditions for, or reject' any proposed `development or operation within, above, or beneath the tidal water below the mean high water mark,' within certain limits. . . ." Town of Warren v. Thornton-Whitehouse, 740 A.2d 1255, 1260 (R.I. 1999) (quoting § 46-23-6(2)).
Pursuant to this statutory authority, the CRMC has promulgated a compendium of regulations entitled The Rhode Island Coastal Resources Management Program ("CRMP"). Like all agency regulations promulgated pursuant to an express grant of statutory authority, the CRMP has the "force of law." Henry v. Earhart, 553 A.2d. 124, 127 n. 1 (R.I. 1989) (quoting Lerner v. Gill, 463 A.2d 1352, 1358 (R.I. 1983)). In conjunction with the CRMP, the Council has promulgated a specific set of rules establishing the procedures to be employed when an individual seeks to alter freshwater wetlands akin to the parcel at issue in the instant matter. See Rules and Regulations Governing the Protection and Management of Freshwater Wetlands in the Vicinity of the Coast ("CRMC Wetlands Rule(s)").
CRMC Wetlands Rule 9.05(A) describes broad, general requirements that must accompany the submission of an application to alter property classified as freshwater wetlands. Rule 9.05(A)(3) provides:
 In order to obtain a permit through an Application to Alter, the applicant must demonstrate through plans, evaluations and supporting documentation that the proposed project does not represent a random, unnecessary, and/or undesirable alteration of any freshwater wetland, area(s) of land within fifty (50) feet, riverbanks, and flood plains, as defined herein. *Page 14 
Wetlands Rule 10.03(B) furnishes greater specificity with respect to what applicants should include in the required "plans, evaluations and supporting documentation" by providing, in relevant part, that an applicant's written evaluation "must . . . include and fully address the separately identified elements . . . in paragraphs [(C) through (H) of Rule 10.03]." Those elements are: wildlife and wildlife habitat; recreations and aesthetics; flood protection; surface water and groundwater; water quality; and soil erosion. See Wetlands Rule 10.03(C)-(H). The Wetlands Rules refer to these elements in the aggregate as the "functions and values" of freshwater wetlands.See Wetlands Rule 10.02(B).
When the Council undertakes an evaluation of an application to alter accompanied by a written evaluation that fully addresses the impact of the proposed alteration on wetland functions and values, the Council must turn to Wetlands Rule 9.05(E)(2), which establishes the bases for CRMC denial of an application to alter. Rule 9.05(E)(2)(a) states that "[a]n application for a proposed alteration to any wetland . . . will be denied by the CRMC if the project as proposed would result in a random, unnecessary, and/or undesirable alteration of a freshwater wetland. . . ." Rule 9.05(E)(2)(b) gives further guidance with respect to the "random, unnecessary, and/or undesirable" standard by providing, in pertinent part:
 In determining whether a proposed alteration of a freshwater wetland . . . is random, unnecessary and/or undesirable, the CRMC shall consider the following:
 (i) Whether the applicant has demonstrated that impacts to freshwater wetlands . . . have been avoided to the maximum extent possible, and that those impacts which are unavoidable have been reduced to the maximum extent possible. . . . *Page 15 
 (ii) Whether the applicant has demonstrated that the proposed project eliminates or minimizes probably impacts to freshwater wetlands functions and values. . . .
 (iii) Whether the proposed project will contribute to adverse cumulative impacts on wetlands. . . .
Before turning to the merits of the instant appeal, the Court acknowledges that a recent advisory opinion issued by our Supreme Court calls into question the ability of the Council to continue as an ongoing concern. In re Request for Advisory Opinion from House ofRepresentatives (Coastal Resources Management Council), 961 A.2d 930,942 (R.I. 2008) (holding that no member of the General Assembly nor appointee of that body may sit on the Council, and appointments to the Council are to be made exclusively by the Governor, with advice and consent of the Senate). Consequently, the General Assembly must likely enact new legislation in order to cure the infirmities of the Council as presently constituted. Importantly, however, the Supreme Court's advisory opinion states that despite constitutional deficiencies in the composition of the Council, "[t]he past acts of [an administrative agency] should be accorded de facto validity." Id. at 942 n. 18. Accordingly, the foregoing rules and regulations as promulgated by the Council will be considered presumptively valid.
 IV Review of the Council's Decision
Appellants first contend that the CRMC's decision is not supported by legally competent evidence. Appellants assert that the Council improperly relied upon evidence obtained as a result of ex parte
communications, which are prohibited under the APA, in rendering a decision on their application. Secondly, Appellants argue that the CRMC's *Page 16 
decision was arbitrary, capricious, and clearly erroneous, as Appellants assert that it ignored uncontradicted and substantial evidence that the proposed alterations met the requirements and standards of the applicable wetland regulations.
Conversely, the Council and Intervenor SPA contend that, contrary to Appellants' assertion, the CRMC did not violate the ex parte provisions of the APA. Further, the Council and SPA argue that the CRMC's final decision in the instant matter was supported by competent evidence in the record and, therefore, not arbitrary, capricious or clearly erroneous. The Court will address each issue in turn.
 A Ex Parte Prohibition under the APA
Like all state agencies authorized by law to make rules or to determine contested cases, save the express exemptions enumerated in § 42-35-18(b), the CRMC is "subject to the provisions of the Rhode Island Administrative Procedures Act. . . ." Ratcliffe v. CoastalResources Management Council, 584 A.2d 1107, 1110 (R.I. 1991); seealso Sakonnet Rogers, Inc. v. Coastal Resources Management Council,536 A.2d 893, 896 (R.I. 1988); East Greenwich Yacht Club v. CoastalResources Management Council, 118 R.I. 559, 568-69, 376 A.2d 682, 687
(1977). Section 42-35-13 of the APA provides:
 Unless required for the disposition of ex parte matters authorized by law, members or employees of an agency assigned to render an order or to make findings of fact and conclusions of law in a contested case shall not, directly or indirectly, in connection with any issue of fact, communicate with any person or party, nor, in connection with any issue of law, with any party or his or her representative, except upon notice and opportunity for all parties to participate; but any agency member: *Page 17 
 (1) May communicate with other members of the agency, and
 (2) May have the aid and advice of one or more personal assistants.
Our Supreme Court recently addressed with considerable specificity the issue of what § 42-35-13 "allows and prohibits in terms of ex parte
communications during the administrative adjudication of contested cases" in Arnold v. Lebel, 941 A.2d 813, 820 (R.I. 2007). Therein, the Court stated:
 First, § 42-35-13 of the APA prohibits ex parte communication with anyone about contested or material adjudicatory facts or opinions concerning the merits of an applicant's pending appeal. . . .
 Second, § 42-35-13 authorizes [agency decision-makers] to engage in ex parte
communication with agency staff members about general matters pertaining to the discharge of his or her duties. . . .
 Third, in accordance with § 42-35-9(e) and § 42-35-10(4), the [agency decision-maker] must provide notice to the parties before a hearing if he or she intends to consult any documentary source or person concerning facts or opinions about the merits of an appeal. In addition, the parties must be afforded an opportunity to contest any such evidence and to cross-examine any people consulted. . . .
 Finally, all evidence that is received or considered must be on the record. Id. at 820-21.
The Court then summarized these principles as follows:
 Unless the parties are given notice and an opportunity to respond on the record, including cross-examination, if appropriate, [an agency decision-maker] may not communicate with anyone, including [agency] staff members, about contested adjudicatory facts. . . . All facts and opinions, including opinions of agency professionals and staff, as well as information obtained from an outside source, such as . . . texts or the Internet, must be included on the record if the [agency decision-maker] plans to base *Page 18 
his final decision on such facts. In short, no litigious facts should reach the decision-maker off the record. . . .
 However, [an agency decision-maker] may communicate with agency staff members about hearing schedules, procedural matters, and general information about how hearings are conducted at [the agency]. Additionally, as long as [an agency decision-maker] does not discuss the contested facts of a particular case, he or she may discuss general policy concerns about the agency's function and goals; he or she may attend staff meetings and may participate in casual discussions about agency policies. A[n] [agency decision-maker] always is permitted to consult state and federal regulations and written policies. In other words, [agency decision-makers] are required to guard against the inherent unfairness of secret evidence, but they are not required to isolate themselves from the agency. Id. at 821-22.
Applying these principles to the case at bar, the Court finds that Councilman Gomez overstepped his authority as an administrative adjudicator by engaging in prohibited ex parte communications in violation of § 42-35-13.
The Court has identified three instances of conduct on the part of Councilman Gomez that merit evaluation in light of our Supreme Court's decision in the Arnold matter. The first of these arises out of comments that Councilman Gomez made on the record at the October 9, 2007 CRMC hearing regarding several trips that he had made to the subject property. Gomez stated:
 I have been all over this property, and I've made it a personal issue this year to stop there on a number of occasions . . . I visited three times during the months of May and June, and in each of these times I went to the upland area where the proposed house is to be located, and in the perc pipes there was always 18 to 20 inches of water. . . . My first [trip], I spent maybe eight or nine, ten minutes, I came out and I removed ten ticks crawling up my leg. There was just a tick infestation. A little later in the year, there was a tremendous amount of mosquitoes. (10/9/07 Hr'g Tr. 80:15-81:15.) *Page 19 
Our Supreme Court has previously held that evidence gleaned from the personal observations of zoning board members pursuant to their inspection of a site under consideration constitutes legally competent evidence upon which a zoning board's decision may rest if the record discloses the nature and character of the observations upon which the board acted. Perron v. Zoning Board of Review of Burrillville,117 R.I. 571, 576, 369 A.2d 638, 641 (1977);see also Dawson v. Zoning Board of Review of Cumberland,97 R.I. 299, 302, 303, 197 A.2d 284, 286 (1964) ("when a [zoning] board of review has made an inspection of premises and disclosed in the record the conditions and circumstances it observed . . . this court will treat such conditions and circumstances so disclosed . . . as constituting legal evidence capable of sustaining a board's decision in an appropriate case."). In addition, our Supreme Court has sanctioned the propriety of such evidence in the context of planning board appeals. Restivo v. Lynch, 707 A.2d 663, 667 (R.I. 1998) ("[city] council members [reviewing planning board decisions] may rely on their own expertise to the same degree and under the same conditions as can members of a zoning board."). Furthermore, neighboring jurisdictions have explicitly extended these principles to the arena of administrative adjudications. See Grimes v. Conservation Com'n of Townof Litchfield, 703 A.2d 101, 107 (Conn. 1997) ("[Conservation] Commissioners are permitted to base their decisions in part on facts within their `peculiar knowledge,' including information gleaned from asite inspection, as long as those facts are disclosed to the parties.") (emphasis added).
In light of the foregoing, it cannot be said that Councilman Gomez's visits to the subject site were improper per se. The administrative record in the instant matter plainly discloses the nature and character of the observations that Gomez made during his visits *Page 20 
to the subject site in accordance with our Supreme Court's pronouncement in Perron. 369 A.2d at 641 ("evidence gleaned from . . . personal observations . . . constitutes legally competent evidence upon which a . . . board's decision may rest if the record discloses the nature andcharacter of the observations. . . .") (emphasis added). Nevertheless, this Court finds that the timing of Councilman Gomez's disclosure precluded Appellants from having or being afforded a fair opportunity to contest the evidence that Gomez placed on the record.
The comments made by Councilman Gomez at the October 9, 2007 CRMC hearing regarding the observations that he made during his visits to the subject property were placed on the record for the first time following the delivery of Appellants' closing argument and mere minutes before the Council held its final vote on the Appellants' application. (10/9/07 Hr'g Tr. 78-80.) Consequently, Appellants were deprived of a reasonable opportunity to meet, test, or challenge the "litigious facts" developed by Councilman Gomez, on his own accord, in violation of the APA as interpreted by our Supreme Court in Arnold. 941 A.2d at 821. Accordingly, this evidence cannot be considered as competent support for the Council's decision.
At the same CRMC hearing, Councilman Gomez also noted that as part of his deliberation over the propriety of the Williamses' application, he had taken it upon himself to consult the Little Compton fire code. According to Gomez:
 I then took a look at the fire code . . . the local captain of the fire department in Little Compton . . . supplied a lot of excerpts from the present fire code. I went on line to look for it and found out that you had to buy the fire code. I didn't purchase it. I don't think CRMC has a copy of it, so I worked with his, what he supplied to me in a cut and paste fashion. (10/9/07 Hr'g Tr. 81:15-82:5.) *Page 21 
In the Arnold decision, our Supreme Court described at length a number of resources that agency decision-makers are well within their purview to consult when deliberating over contested cases. Id. at 821-22. Among those resources, the Court explicitly stated that an agency decision-maker "always is permitted to consult state and federal regulations and written policies." Id. at 822. With this pronouncement in mind, the Court finds that Councilman Gomez's consultation of the fire code for the City of Little Compton falls within the category of civic regulations and written policies that an agency decision-maker may always consult with in an ex parte fashion without running afoul of the prescriptions of § 42-35-13.[7] Id.
Finally, this Court must address Councilman Gomez's conversation with Captain Medeiros regarding the "buffer preferences" of the Little Compton Fire Department. At the October 9, 2007 CRMC hearing, Councilman Gomez stated the following:
 I spoke with the local captain of the fire department in Little Compton, Captain Medeiros . . . and I asked him . . . what the fire department would like to see in an area to access the building, and basically . . . he had indicated to me that the fire department would certainly like to see a 20-foot buffer around the building, an ambulance, those types of emergencies that would require access to the back of the building. We heard tonight that this is still a 10-foot buffer. (10/9/07 Hr'g Tr. 81:15-82:11.)
This Court finds that the conversation Councilman Gomez engaged in with Captain Medeiros is precisely the type of ex parte communications forbidden by § 42-35-13, pursuant to our Supreme Court's decision inArnold. *Page 22 
In the Arnold decision, the Court made it clear that agency decision-makers "must provide notice to the parties before a hearing if he or she intends to consult any documentary source or person concerning facts or opinions about the merits of an appeal." Id. at 821 (emphasis added). In addition, "the parties must be afforded an opportunity to contest any such evidence and to cross-examine any peopleconsulted. . . ." Id. (emphasis added). Here, Councilman Gomez stated that he consulted Captain Medeiros concerning the opinion of the Little Compton Fire Department regarding the propriety of the Williamses' proposed buffer areas. (10/9/07 Hr'g Tr. 81:15-82:11.) Further, it is undisputed that the Williamses were not provided an opportunity to cross-examine Captain Medeiros concerning his opinion on this matter. Accordingly, the Court finds that the information Councilman Gomez presented to the Council concerning his interaction with Captain Medeiros constitutes information obtained as a result of inappropriateex parte communications. Consequently, this evidence cannot be considered as competent support for the Council's decision.
As noted in a recent Rhode Island Superior Court decision, the holding in Arnold provided great clarity with respect to determining the existence of illicit ex parte communications in the administrative context; however, it did not provide a specific remedy for improperex parte contact violative of § 42-35-13. Champlin's Realty Associatesv. Coastal Resources Management Council, 2008 WL 5707848. One such remedy employed by courts faced with circumstances similar to the underlying facts of the case at bar is disqualification of the offending party's vote from the matter at hand. Id. (holding that the votes of CRMC members who should have been disqualified from participating in a full Council vote must be subtracted from the final tally); seealso *Page 23 Acierno v. Folsom, 337 A.2d 309 (Del. 1975); South Brunswick Associatesv. Township Council of Tp. of Monroe, 667 A.2d 1, 4 (N.J.Super. 1994).
Notwithstanding the foregoing, this Court need not decide whether theex parte communications at issue in the instant matter merit disqualification of Councilman Gomez from participating in the Council's consideration of the Williamses' proposal. Were the Court to disqualify Councilman Gomez's vote, the remaining votes cast would still result in a final tally of 4 to 3 in favor of denial. Accordingly, this Court must next address the ultimate issue in this case, to wit, whether the findings of the CRMC, as set forth in its written decision, are sufficient to support the Council's decision to deny the Williamses' application to alter the subject lot.
 B Sufficiency of Competent Evidence
"It is a `simple but fundamental rule of administrative law' that an `agency must set forth clearly the grounds on which it acted.'"Town of Burrillville v. Pascoag Apartment Associates, LLC, 950 A.2d 435,451 (R.I. 2008) (quoting Atchison, Topeka Santa Fe Railway Co. v.Wichita Board of Trade, 412 U.S. 800, 807, 93 S.Ct. 2367, 37 L.Ed.2d 350
(1973)). This fundamental rule is codified in § 42-35-12, which states that "[f]indings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings." Furthermore, "[a]n administrative decision that fails to include findings of fact required by statute cannot be upheld." Sakonnet Rogers, Inc., 536 A.2d at 896-97 (citing EastGreenwich Yacht Club, 376 A.2d at 687). *Page 24 
In the instant matter, the conclusions of law set forth by the Council in its written decision rest on sixteen enumerated findings of fact. The first ten findings of fact state the following:
 1. The proposed project location is 645 West Main Road, Little Compton, RI.
 2. The coastal feature is freshwater wetlands.
 3. The applicable provisions of the CRMP are contained within the Freshwater Wetlands Program as more fully set forth in the staff reports and incorporated herein by reference.
 4. As set forth in the record, the plan originally filed was a 30' x 48' ft dwelling which was modified to a 24' by 36' foot dwelling as set forth in the record and incorporated herein by reference with no permanent disturbance of the wetlands. However the proposal includes a 375' ft temporary disturbance of wetlands for construction of a well which ultimately would re-vegetate.
 5. The project as modified will alter 5,350 square feet of perimeter wetlands.
 6. The CRMC staff biologist, as more fully set forth in his staff report and incorporated herein by reference, recommended that the Council approve the modified application.
 7. Objectors to the application included the Sakonnet Preservation Association, Conservation Law Foundation ("CLF"), and Save the Bay (collectively "the objectors").
 8. As more fully set forth in the record, the applicant offered both written and oral testimony in support of its application which was made part of the administrative record.
 9. CLF argued to the Council that it should not accept the recommendation of the CRMC staff biologist because the house would be located entirely within the jurisdictional wetland. They argued that the applicant bought the property aware that the property contained wetlands and *Page 25 
due to concerns about setting a bad precedent for building in jurisdictional wetlands, the application should be denied.
 10. All of the objectors argued that the Council should not act on the application because the applicant was in non-compliance with its local approvals. The Council finds that issues associated with compliance with local approvals is a matter to be enforced by the local approving authority and not the CRMC. (Decision at 1-2.)
The Council's first two findings simply describe the geographical characteristics of the lot and note the fact that it has been designated as a freshwater wetland area. The third finding incorporates the Wetlands Rules by reference, but contains no factual findings with respect to the instant matter. The fourth finding relates to an early iteration of the Williamses' proposal rather than the proposal that was before the Council. The Council's sixth finding recounts the fact that David Reis actually recommended approval of the Williamses' application. Finding number seven only acknowledges the fact that there were several objectors to the Williamses' application. The Council's eighth finding states that "the applicant offered both written and oral testimony in support of its application," without making specific reference to the substantive information in the cited written and oral testimony. Findings nine and ten merely restate arguments of the objectors. Notably, not one of these findings addresses the impact of the proposed alterations on the freshwater wetland's functions and values nor whether the proposed plan would result in a random, unnecessary, and/or undesirable alteration of a freshwater wetland as required by the relevant CRMC Wetlands Rules.[8] See Section III, supra. Accordingly, the Council's reliance on these findings to support its conclusions of law is clearly erroneous. *Page 26 
The findings of fact numbered 11 through 14 constitute the crux of the Council's decision.[9] Those findings read, in their entirety, as follows:
 11. During the course of the hearings a Council member who was familiar with the site stated that in the months of May and June the area adjacent to the structure was inundated with 18 to 20 inches of water. Also, there was a great deal of tick infestation on the site.
 12. Council members expressed concern that because this house would only have a 10 ft setback, the setback would not be sufficient for emergency access.
 13. The Council finds that given the limited 10 ft setback, the abundance of insects and invasive species on site, and past experience, if it were to approve this project it is most likely that the applicant will ultimately return to CRMC seeking further relief in order to separate the structure from the area of vegetation.
 14. The Council members in the majority find that while respecting the opinions of the CRMC staff, a recommendation for approval by the staff is inconsistent with recommendations for denial on other similarly situated projects. On previous applications the staff expressed opposition to a 10 ft buffer from an undisturbed edge of *Page 27 
vegetation and opined 10 ft would not be sufficient to meet basic safety and dwelling maintenance concerns as well as fire safety and emergency vehicle access. Further, the Council majority is concerned about the precedential and cumulative effects of approving a project with the minimal buffers proposed in this application.
(Decision at 2.)
Findings of fact 11, 12, and 13 recount information presented to the Council at its October 9, 2007 meeting pursuant to the colloquy initiated by Councilman Gomez.[10] (10/9/07 Hr'g Tr. 80-82.) Because this Court has determined, in Section IV A, supra, that this information constitutes evidence obtained as a result of statutorily prohibitedex parte communications, this evidence cannot be considered as competent support for the Council's decision. Accordingly, the validity of the Council's decision rests on whether or not the information set forth in finding of fact 14 amounts to "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, [meaning] more than a scintilla but less than a preponderance." Wayne Distrib.Co., 673 A.2d at 459 (citing Newport Shipyard Inc., 484 A.2d at 896).
The Council's fourteenth finding of fact consists primarily of the Council's assertion that the "recommendation for approval by [CRMC] staff is inconsistent with recommendations for denial on other similarly situated projects." (Decision at 2.) Our Supreme Court has previously found the judicial doctrine of stare decisis applicable to administrative agencies. See Johnston Ambulatory Surgical Associates,Ltd. v. Nolan, 755 A.2d 799 (R.I. 2000). The Court has observed that "[b]ecause the actions of administrative agencies are frequently quasi-judicial in nature, courts have found it useful *Page 28 
to apply . . . [the] judicial doctrine . . . [of stare decisis] to administrative agencies." Id. at 808 (citing Atchison, T. S. F. Ry.Co., 412 U.S. 800, 807-08, 93 S.Ct. 2367, 2375 (1973)). Consequently, an agency "may articulate the basis of its order by reference to otherdecisions." Atchison, T. S. F. Ry. Co., 412 U.S. at 807,93 S.Ct. at 2375 (citations omitted) (emphasis added).
These principles notwithstanding, finding of fact 14 in the case at bar cites as precedent staff recommendations on unnamed "similarly situated projects," rather than the final Council decisions arising out of the cited, but unidentified, projects. Moreover, finding of fact 14 constitutes yet another attempt by the Council to bootstrap the "buffer issue" into proper consideration.[11] As noted above, Councilman Gomez's statements relating to "buffer preferences" cannot be considered competent evidence in the matter at hand; consequently, this finding cannot constitute evidence that adequately supports the Council's conclusions of law. Therefore, having evaluated all of the findings of fact articulated by the Council as the basis of its decision in the instant matter, the Court finds that the Council's written decision "fails to include findings of fact required by statute," and, accordingly, it "cannot be upheld." Sakonnet Rogers, Inc.,536 A.2d at 896-97 (citing East Greenwich Yacht Club, 376 A.2d at 687).
Furthermore, the Court finds that the CRMC's denial of Appellants' application was arbitrary and capricious. The CRMC repeatedly encouraged the Appellants to *Page 29 
reduce the footprint of the proposals presented to the Council in an effort to minimize wetlands disturbance to the subject property. After leading Appellants down that path, the Council then used the specifications of the Appellants' final revised proposal, which featured a "significant reduction" in footprint size, as a basis to declare that insufficient setbacks in the final proposal mandated denial of Appellants' application. (10/9/07 Hr'g Tr. 66:4.) Consequently, the Court finds that the Council's final decision in the instant matter was arbitrary and capricious, in violation of § 42-35-15(g)(6).
 C Remand or Reverse
Pursuant to § 42-35-15(g), this Court is vested with the authority to "remand [a deficient administrative decision] for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings" are,inter alia, clearly erroneous view of the reliable, probative, and substantial evidence on the whole record. In Sakonnet Rogers, Inc. v.Coastal Resources Management Council, 536 A.2d 893 (R.I. 1988), our Supreme Court found that the CRMC's decision to deny an applicant's request to build a foundation on coastal lands was not based on any relevant regulatory factors. Id. at 897. Subsequently, the Court eschewed resort to a remand, reasoning that
 [t]o delay the administrative process further by remanding the case to CRMC for additional consideration of a petition filed seven years ago would prejudice the right of the petitioner to a final adjudication of his petition within a reasonable period. It is clear to us that since CRMC failed to deny the petition on the basis of any of the [regulatory] criteria, the petitioner is entitled to a judgment in the Superior Court reversing CRMC's decision on its application. Id. *Page 30 
See also Ratcliffe, 584 A.2d at 1111 (refusing to remand case for further consideration because right of property owners to a final adjudication within a reasonable period would have been prejudiced).
In accordance with our Supreme Court's decision in Sakonnet Rogers,Inc., this Court finds that remanding the Williamses' application to CRMC would "prejudice the right of the [Appellants] to a final adjudication of [their application] within a reasonable period."Sakonnet Rogers, Inc., 536 A.2d at 897. Given the General Assembly's need to enact a new CRMC statutory scheme, see Advisory Opinion; Section III, supra, remanding the instant matter to the Council for reconsideration would consign the Williamses' application, now pending for nearly five years, to a veritable "bureaucratic morass."[12]Ratcliffe, 584 A.2d at 1110. Consequently, having found that the CRMC's denial of the Appellants' application was arbitrary, capricious, characterized by abuse of discretion, and affected by error of law under § 42-35-15(g), the Council's decision is hereby reversed.
 V Conclusion
After a thorough review of the entire record, this Court finds that the CRMC's denial of the Appellants' application for permission to alter freshwater wetlands subject to CRMC regulations was "clearly erroneous in view of the reliable, probative and substantial evidence on the whole record." Section 42-35-15(g)(5). The final decision was arbitrary, capricious, characterized by abuse of discretion, and in violation of *Page 31 
statutory provisions. Section 42-35-15(g). Substantial rights of the Appellants have been prejudiced. Accordingly, the decision of the CRMC is hereby reversed.
Counsel shall submit an appropriate order consistent with this decision.
[1] CRMC Wetlands Rule 5.40 provides:
 Freshwater Wetland means the following:
 A. Bog, pond, marsh, swamp, river, area(s) subject to flooding, area(s) subject to storm flowage, floodway, flowing body of water, stream, intermittent stream, submergent and emergent plant communities, special aquatic sites, and shrub and forested wetland located in the vicinity of the coast;
 B. Those areas located in the vicinity of the coast, that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions; and
 C. Any or all wetlands located in the vicinity of the coast, created as part of, or the result of, any activity permitted or directed by the DEM after July 16, 1971, including, but not limited to: restored wetlands; value replacement wetlands created to compensate for wetland loss such as flood plain excavations; biofiltration areas; and any wetlands created, altered or modified after July 16, 1971.
 The Director has the sole authority to determine which areas are freshwater wetlands located in the vicinity of the coast.
[2] CRMC Wetlands Rule 10.03(A)(2) provides:
 All applicants submitting an Application to Alter must submit a written evaluation which, in accordance with those requirements set forth herein, describes those functions and values provided and/or maintained by the subject freshwater wetland, area(s) of land within fifty (50) feet, riverbanks, and/or flood plain; describes and assesses any anticipated impacts to the wetlands, area(s) of land within fifty (50) feet, riverbanks, and flood plain's functions and values; and describes all structural and/or non-structural best management practices, best available technologies, schedules and management plans which will be employed to eliminate, avoid, and/or reduce impacts to freshwater wetlands, area(s) of land within fifty (50) feet, riverbanks, and flood plains to the maximum extent possible.
[3] CRMC Wetlands Rule 10.01(A) states, in relevant part:
 All applicants submitting an Application to Alter . . . must demonstrate to the CRMC in writing that all probable impacts to freshwater wetlands, area(s) of land within fifty (50) feet, riverbanks, and flood plains, have been avoided to the maximum extent possible. If impacts cannot be avoided, the applicant must satisfactorily demonstrate in writing that there are no alternatives to the proposed alterations which would not alter the natural character of any freshwater wetlands, area(s) of land within fifty (50) feet, riverbanks, and flood plains. The written evaluation must describe what steps were taken to avoid impacts to freshwater wetlands, area(s) of land within fifty (50) feet, riverbanks, and flood plains.
[4] Additional objectors, among them, Heather Steers ("Steers") from Intervenor SPA and Wendy Waller ("Waller") from Save The Bay, also testified at the hearing. (3/28/06 H'rg Tr. 130-160.) The concerns voiced by Steers and Waller were substantially similar to the concerns expressed by Ms. Giles in her comments before the Council.
[5] The Court notes with interest the language of CRMC Wetlands Rule 9.05(E)(3)(a), which states, in pertinent part, that "[t]he CRMCshall issue a permit for an application [to alter] which, in the opinionof the Director, does not represent a random, unnecessary, and/or undesirable alteration of freshwater wetlands. . . ." (emphasis added). Our Supreme Court has stated that "the use of the word `shall' contemplates something mandatory or the `imposition of a duty.'"Castelli v. Carcieri, 961 A.2d 277, 284 (R.I. 2008) (citations omitted). However, because neither party has raised the issue of whether Rule 9.05(E)(3)(a) is applicable to the case at bar, the Court need not address the issue at this time.
[6] This continuance, unlike the two that preceded it, arose out of the Council's desire to resolve some uncertainties surrounding a zoning issue related to the subject property, rather than out of the Council's desire to have the Williamses further modify their site plan proposal. (9/11/07 Hr'g Tr. 81-82.)
[7] Though the Court finds that Councilman Gomez's consultation of the Little Compton fire code does not constitute a violation of § 42-35-13, the Court notes that relying on a fire code provided by a third-party in a "cut and paste fashion" is not necessarily the ideal manner by which one should pursue such an endeavor. See Arnold, 941 A.2d at 821-22.
[8] Finding number 5 notes that "[t]he project . . . will alter 5,350 square feet of perimeter wetlands." While this finding does address the geographical impact of the proposed alterations on jurisdictional wetlands, it fails to address the impact of the proposed alterations on wetland functions and values as required by the relevant CRMC Wetlands Rules.
[9] The Council made a total of sixteen findings of fact. The Council's findings of fact numbered 15 and 16 read:
 15. The Council finds by a 5 to 3 vote that the applicant has not met its burdens of proof under the applicable sections of the CRMC regulations.
 16. Based on the foregoing, the majority finds there is a reasonable probability of conflict with a plan or program for management of the State's coastal resources as well as damage to the coastal environment of the State of Rhode Island as a result of this proposal.
The fifteenth finding of fact simply recounts the tally of the Council's vote on the Williamses's application. The sixteenth finding of fact amounts to a final summation of the Council's position on the instant matter, as it refers back to the "foregoing" findings of fact rather than delineating an additional basis for its decision. As such, neither "finding of fact" contains substantive information about the underlying facts in this matter. Therefore, the Council's reliance on these findings to support its conclusions of law is clearly erroneous.
[10] In addition to recounting information presented to the Council during the colloquy initiated by Councilman Gomez, finding of fact 13 features an assertion that "it is most likely that the applicant will ultimately return to CRMC seeking further relief in order to separate the structure from the area of vegetation." This portion of finding of fact 13 is wholly speculative and cannot be considered competent evidence upon which the Council's decision may rest.
[11] Finding of fact 14 reads, in relevant part:
 On previous applications the staff expressed opposition to a 10 ft buffer from an undisturbed edge of vegetation and opined 10 ft would not be sufficient to meet basic safety and dwelling maintenance concerns as well as fire safety and emergency vehicle access. Further, the Council majority is concerned about the precedential and cumulative effects of approving a project with the minimal buffers proposed in this application. (Decision at 2.)
[12] Once new legislation is in place, the Governor will still have to appoint new council members to CRMC, and those individuals will have to obtain the advice and consent of the Senate, thereby further delaying a reevaluation of the Williamses's application.